UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROBERT MACLEOD,                                           **DECISION AND ORDER**

                                  Petitioner,                          1:20-CV-01680 EAW

                  v.

TIMOTHY McCARTHY, Superintendent,

                                  Respondent.

_____

I.      **INTRODUCTION**

        *Pro se* petitioner Robert MacLeod ("Petitioner") seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  (Dkt. 1).  Petitioner challenges the constitutionality of the

judgment entered against him on March 24, 2017, in New York State, Niagara County

Court (Murphy, J.), following a jury verdict convicting him of, *inter alia*, second-degree

robbery as a sexually motivated felony (New York Penal Law ("P.L.") §§ 160.10(2)(a),

130.91).  (*Id.* at 1).[1]  Petitioner is serving an aggregate sentence of 15 years' imprisonment

plus 15 years' post-release supervision.[2]   For the reasons below, the Court grants

Petitioner's request (Dkt. 54) to withdraw the unexhausted claims of ineffective assistance

_____

[1]      Page citations to Petitioner's pleadings are to the pagination automatically generated
by the Court's case management and electronic filing system (CM/ECF) and located in the
header of each page.  Page citations to Respondent's pleadings are to the original
pagination.

[2]      *See* https://nysdoccslookup.doccs.ny.gov/ (results for DIN 17B1220) (last accessed
July 19, 2024).

of trial and appellate counsel; dismisses these unexhausted claims without prejudice; denies

habeas relief on the petition's two remaining claims; and dismisses the petition.

## II.   BACKGROUND

### A.   State Court Proceedings

On May 11, 2016, a Niagara County grand jury returned an indictment against

Petitioner charging him in connection with the December 26, 2015 robbery and assault of

a woman ("K.N." or "the complainant") near the Discovery Center in Niagara Falls.  (SR-

s: 32-33).[3]  The four counts in the indictment were:  (1) second-degree robbery in violation

of P.L. § 160.10(2)(a) (caused physical injury) (count one); (2) second-degree robbery in

violation of P.L. §§ 160.10(2)(a), 130.91 (robbery as a sexually motivated felony) (count

two); (3) first-degree sexual abuse in violation of P.L. § 130.65(1) (sexual contact by

forcible compulsion) (count three); and (4) second-degree assault in violation of P.L.

§ 120.05(6) (caused physical injury during a robbery) (count four).  (SR-s: 32-33).

Petitioner proceeded to a jury trial on the indictment before Niagara County Court

Judge Matthew Murphy ("trial court").  K.N. testified that she was from Japan and was

visiting the United States with a tour group.  On December 25, 2015, she left her hotel

sometime after 11 p.m. and started walking around Niagara Falls looking for the pedestrian

bridge to the Canadian side of the Falls.  (T: 703-05).  K.N. approached a man, whom she

---

[3]    Citations to "SR-s:" refer to the Bates-stamped page numbers of the state court
records, filed manually under seal at Docket 18.  Citations to "T:" and "S:" refer to the
pages of the trial transcript and sentencing transcript, respectively.  These transcripts are
contained on a compact disc ("CD") also filed manually under seal at Docket 18.  Citations
to "SR:" refer to the Bates-stamped page numbers of the state court records not covered by
the sealing order (Dkt. 14) and electronically filed at Docket 16-1.

identified as Petitioner at trial, and asked for directions.  (T: 707, 747).[4]  He said he had just come from the other side of the Falls and would show her where to cross over.  (T: 707).

After walking for about 10 minutes, K.N. questioned whether they were going in the right direction; Petitioner said, "oh," and seemed surprised.  (T: 714-15).  He turned around and started walking towards the Aquarium Center, which was nearby.  (T: 715).  Petitioner said to K.N., "your shoes sound bigger."  (T: 715-16).  He then asked, "can I clean it for you," and "bent down to touch [her] shoes."  (T: 717).  K.N. said "no" and "bent down to stop him."  (*Id.*).  Petitioner struck K.N. in the face and head with his hand, knocking her down; he hit her again while she was on the ground, causing her head to strike the concrete.  (*Id.*).

Petitioner grabbed K.N.'s purse and walked away, and she asked if she could at least have her passport back.  (T: 718).  Petitioner walked back to her and said, "shut up, you give me what I want, I will let you go."  (T: 719).

Petitioner then dragged K.N. to a dark, wooded area.  (T: 721).  He took off her shoes, touched her foot with his hand, moved it to his genital area, and told her to "rub it," meaning his penis.  (T: 721-22, 723).  She complied; Petitioner said "good" and made some gurgling-type noises.  (T: 723).  Petitioner then put his hand up K.N.'s dress, touched her

---

[4]     Part of the incident was recorded on surveillance videotape; a DVD of the videotape was introduced into evidence and played for the jury.  (T: 482-83, 485).  During her testimony, K.N. identified herself and Petitioner on the videotape.  (T: 707-12, 719)

hip, and asked if she wore underwear.  (T: 723-24).  She said yes and also said, falsely, that she had her period.  (T: 724).

Petitioner stopped touching her and began rummaging through her purse, asking what type of currency, and how much of each type, she had in her possession.  (T: 725). He then said, "don't move[,] I will come back soon."  (T: 728).  Petitioner took her purse and shoes and walked away.  (T: 729).

After waiting several minutes, K.N. believed that Petitioner was not returning, so she searched, unsuccessfully, for her shoes and passport.  (T: 732).  She eventually called the tour guide and let him know what happened.  (T: 733).  The tour guide called 911, and several police officers responded to the scene.  (T: 734).  K.N. gave a statement to the officers and was taken to the hospital.  (T: 736-37).

In December 2015, Mary Nadeau ("Nadeau") was working as a clerk at Star Food Mart, a convenience store near the Rainbow Bridge in Niagara Falls.  (T: 427).  Nadeau did not know Petitioner's name, but she identified him as one of the store's regular customers and described seeing and interacting with him on multiple occasions.  (T: 430-38).  Nadeau viewed still images from the store's surveillance camera videotape and identified Petitioner for the police.  (T: 439-41).

In April 2016, Petitioner came into the store one night at about 8 or 9 p.m.  (T: 441). Petitioner accused Nadeau of providing his name to law enforcement authorities and causing him to be arrested.  (T: 442, 455).  He also said that "he wasn't going to get caught because the District Attorney's office was not going to send th[e] lady back from Japan to testify against him."  (T: 441).

Lieutenant Patrick Moriarty ("Moriarty") of the New York State Park Police testified that on December 30, 2015, Petitioner was stopped while driving on Rainbow Boulevard in Niagara Falls because his car matched the suspect's vehicle as depicted on the surveillance camera videotape.  (T: 500, 538-39).  Moriarty brought Petitioner to the police station and administered the *Miranda* warnings to him, and Petitioner signed a waiver-of-rights card.  (T: 549-55).  Moriarty informed Petitioner that they had surveillance video of the crime showing a person who looked like him and driving the same car he drove.  (T: 559-60).  Petitioner repeatedly said it could not have been him.  (*Id.*).

When Petitioner was informed that the victim still was in the United States and could not return to Japan without her passport, he was silent at first.  (T: 572).  Petitioner then announced he would take the police to the location of the victim's purse as long as he could go home to take care of his father and his dog.  (*Id.*).

Moriarty told Petitioner that before they "talk[ed] about this deal," he wanted to know why the incident occurred.  (*Id.*).  Petitioner replied, "I took the girl over there.  We had an argument.  I hit her.  She hit me.  I hit her again, and then I took the purse to make it look good."  (T: 572).  Petitioner stated he had disposed of the purse but that the victim's passport was at his parents' house.  (T: 610-11).  In response to Moriarty's question about what Petitioner was doing with the shoes, Petitioner's eyes "opened way up," and he said, "I have no idea what you're talking about . . . [N]o way am I talking about that."  (T: 573-74).  Petitioner arranged for his mother to turn the passport over to the police, which she did.  (T: 612, 664-68).

One of Petitioner's former co-workers, Josephine Lawler ("Lawler"), testified that she had daily conversations with Petitioner in 2013 and 2014 during break-times at work. (T: 677-81, 683-84). Petitioner told Lawler that he "would go looking for [Asian women] or stalking them" at the casino, the outlet mall, and the Niagara Falls tourist area. (T: 682-83). He told Lawler he was "going to find one to abduct and duct tape and put in his trunk." (T: 682). He explained that he liked Asian women because they were "small in stature all the way around" and, in particular, he liked that their feet were "small." (*Id.*). Petitioner told Lawler about his plans to "hoard [the women] in his basement, sexually assault them, [and] make them do his chores around his home." (*Id.*). He said he would "[b]eat them if he had to, smack them around, tie them up," especially if they "got out of line" or "tried to . . . object to anything." (T: 684). He never talked about any other women except Asian women. (*Id.*).

Petitioner testified that Lawler's testimony was false. (T: 847-48). He admitted having an encounter near the Falls with a woman on the night of December 25, 2015; however, he did not believe that K.N. was the individual he spoke with. (T: 853-54, 870-71). He testified that the woman he saw near the Falls asked him a question and in response, he "pointed down to the walkway going towards the Aquarium." (T: 855). As he walked with the woman in that direction, she became "very agitated about something." (T: 855-56). When Petitioner pointed to a map near the building, the woman just "look[ed] at [him] very funny." (T: 856-57).

Petitioner and the woman kept walking to the Maid of the Mist elevator, at which point the woman "got agitated again and struck him." (T: 857). Petitioner said "good-bye"

and walked away, but she kept following him even though he repeatedly told her to stop. (T: 858, 860). He "thump[ed]" the woman to "let her know [he] wasn't playing around." (T: 861). Afraid she might have a weapon in her purse she could use to attack him, Petitioner threw the woman's bag towards the Falls gorge. (T: 861-62). Petitioner then left in his car, which was parked nearby. (T: 863).

Prior to summations, the prosecutor elected to dismiss count four charging second-degree assault to avoid the possibility of inconsistent verdicts should the trial court instruct the jury on second-degree assault as a lesser included offense of the second-degree robbery charged in count one. (T: 950).

The jury was charged on the remaining counts in the indictment (counts one, two, and three), as well as several lesser included offenses on the two robbery counts. (T: 1042-56, 1058-64). The jury returned a verdict finding Petitioner guilty of the three remaining counts in the indictment. (T: 1123).

On March 24, 2017, the trial court sentenced Petitioner to concurrent terms of 15 years' imprisonment plus an aggregate term of 15 years' post-release supervision on the two robbery convictions, to be served consecutively with a determinate sentence of seven years' imprisonment plus 10 years' post-release supervision on the sexual abuse conviction. (S: 16-17).

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division"). (SR-s: 1-113). On June 29, 2018, the Appellate Division unanimously modified the judgment on the law and as a matter of discretion in the interest of justice by: (1) reversing

- 7 -

the conviction on count one (second-degree robbery causing physical injury); (2) dismissing count one; and (3) ordering the sentences imposed on counts two and three to run concurrently with each other. *People v. MacLeod*, 162 A.D.3d 1751 (4th Dep't 2018); (SR: 132-33). The judgment, as modified, was affirmed. (*Id.*). The New York Court of Appeals denied leave to appeal on September 13, 2018. *People v. MacLeod*, 32 N.Y.3d 1005 (2018); (SR: 136).

Petitioner filed a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 on December 5, 2019. (SR-s: 137-534). The trial court denied the motion on March 10, 2020. (SR: 568-70). The Appellate Division denied leave to appeal on October 26, 2020.[5] (SR: 601-02).

### B.    Federal Habeas Proceeding

In his petition filed on November 10, 2020 (Dkt. 1 at 9), Petitioner asserted entitlement to habeas relief on the following grounds: defense counsel was ineffective (*id.* at 6); appellate counsel was ineffective (*id.*); the trial court made erroneous rulings (*id.*); and the Appellate Division erroneously denied the application for leave to appeal the trial court's denial of the C.P.L. § 440.10 motion (*id.* at 7). The first three claims are listed under the heading for Ground One (*id.* at 6); the fourth claim is listed under the heading for Ground Two  (*id.* at 7).

---

[5]    The Appellate Division's order denying leave was dated and signed October 26, 2020, not October 29, 2020, as Respondent asserts.  October 29, 2020 was the date on which the Clerk of the Appellate Division certified the order denying leave as a true copy of the original order on file with the Appellate Division's Clerk's Office.  (SR: 602).

Respondent filed an answer (Dkt. 16) and memorandum of law in opposition to the petition (Dkt. 15).[6]  In addition to raising the procedural defenses of untimeliness, failure to exhaust, and procedural default, Respondent argued that none of the claims warrant habeas relief because they are not cognizable, meritless, or both.  (*See id.* at 6-26).

Petitioner sought multiple extensions of time to file a reply but never did so.  Instead, Petitioner moved for a stay-and-abeyance and to add a claim that defense counsel was ineffective for: (1) failing to introduce photographs and a "photo log" that purportedly refuted the testimony of the police officer who accompanied the complainant to the hospital and the registered nurse who examined her; and (2) failing to object to the prosecutor's summation.  (Dkt. 31).  Both requests were denied by United States District Judge Lawrence J. Vilardo.  (Dkt. 49).[7]

On June 17, 2024, this Court issued a Decision and Order (Dkt. 53) finding that the petition was a mixed petition containing exhausted and unexhausted claims.  In particular, the Court determined that the claims of ineffective assistance of trial counsel and ineffective assistance of appellate counsel were fully unexhausted (*id.* at 10-11); that the claims of trial court error were unexhausted but should be deemed exhausted and procedurally defaulted (*id.* at 12-14); and that the claim premised on the Appellate

---

[6]   Respondent requested and obtained permission to file the transcripts and portions of the state court records under seal.  (Dkt. 13; Dkt. 14).

[7]   This case was transferred from Judge Vilardo to the undersigned on June 11, 2024.  (Dkt. 52).

Division's denial of his application for leave to appeal the C.P.L. § 440.10 motion was not cognizable on federal habeas review (*id.* at 14-15).

The Court discussed the four procedural options available in cases involving a mixed petition and determined that only two of them were appropriate in Petitioner's case. (*Id.* at 15-19).  Petitioner could either proceed with all four claims, exhausted and unexhausted; or delete the unexhausted ineffective assistance claims and proceed on the remaining two claims.  (*Id.* at 19-20).  Petitioner was directed to notify the Court which option he wished to pursue.  (*Id.*).  Petitioner also was given the opportunity to argue why the Court should excuse the procedural default of the claim based on the trial court's alleged errors.  (*Id.*).

Petitioner timely responded to the Court's Decision and Order (Dkt. 53) indicating that he "reiterates[8] his motion to delete the unexhausted claims." (Dkt. 54 at 1).  Petitioner also states that he filed a motion for a writ of error *coram nobis* on June 5, 2024, prior to receiving the Court's Decision and Order.  (*Id.*).  The *coram nobis* motion, a copy of which is attached to Docket 54 (*id.* at 3-12), asserts a new claim—that because "the indictment was never <u>filed</u> with the court (CPL § 190.65(3)) before trial, the trial was a nullity." (*Id.* at 8 (underlining in original)).[9]  Finally, Petitioner attaches a letter from one of his former

[8]     The Court notes Docket 54 is the first time Petitioner has requested to withdraw the unexhausted claims in the petition.

[9]     This claim is not appropriately raised in a *coram nobis* motion.  *See Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) ("'In a criminal action, the writ of error *coram nobis* lies in [the state appellate court] only to vacate an order determining an appeal on the ground that the defendant was deprived of the effective assistance of appellate counsel.'" (alteration in original (quoting *People v. Gordon*, 183 A.D.2d 915, 915 (2d Dep't 1992)

defense attorneys in response to Petitioner's inquiry seeking names of attorneys who could represent him in his attempts to have his conviction overturned.[10]  (*Id.* at 14-15).

## III.   <u>TIMELINESS</u>

Respondent has raised the affirmative defense of non-compliance with the one-year statute of limitations in 28 U.S.C. § 2244(d)(1), which the Second Circuit has held is not jurisdictional.  *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).  Because Respondent's untimeliness argument does not implicate the Court's subject matter jurisdiction, and because the petition is easily resolved in Respondent's favor on alternative grounds, the Court will bypass the potentially complicated timeliness analysis.  *See, e.g., Pough v. United States*, 442 F.3d 959, 965 (6th Cir. 2006) ("Whether Pough has complied with the . . . limitations period is therefore not an issue that we have to decide as a threshold matter, as we would have to do if satisfying the limitations period were a jurisdictional prerequisite.

---

(citing *People v. Bachert*, 69 N.Y.2d 593, 594 (1987))))).  Moreover, the claim does not appear to have merit.  C.P.L. § 190.65(3) provides that "[u]pon voting to indict a person, a grand jury must, through its foreman or acting foreman, file an indictment with the court by which it was impaneled."  N.Y. Crim. Proc. § 190.65(3).  However, "[t]he filing requirement is 'a ministerial act and not necessary to giving finality to a Grand Jury's decision.'"  *United States v. Reed*, 756 F.3d 184, 189 (2d Cir. 2014) (quoting *People v. Wesley*, 161 Misc. 2d 786, 791 (N.Y. Sup. Ct. 1994) (citing *People v. Cade*, 74 N.Y.2d 410, 416 (1989))).  This is "because it is upon the voting of a true bill that the Grand Jury 'ha[s] accepted the People's evidence as sufficient to support the charges.'"  *Id.* (alteration in original (quoting *Cade*, 74 N.Y.2d at 416)).  "At that moment, the Grand Jury becomes obligated by statute to file an indictment, but the failure to do so immediately or even promptly is not a 'jurisdictional defect' in the indictment or the true bill itself."  *Id.* (quoting *Cade*, 74 N.Y.2d at 416).

[10]    It is unclear why Petitioner attached this letter to his response.

We may instead proceed directly to the merits of Pough's case, which can be resolved in a straightforward manner and will also result in the denial of his motion.").

## IV.  DISCUSSION

### A.  The Claim Based on Trial Court Error Is Subject to an Unexcused Procedural Default

Petitioner asserts that the trial court erred by: (1) preventing defense counsel from litigating the presentence investigation report before sentencing; (2) denying defense counsel the opportunity to conduct a complete cross-examination of unspecified witnesses; and (3) depriving defense counsel the ability to control the publicity surrounding Petitioner's case by allowing news reporters to take still photographs at his arraignment. (Dkt. 1 at 6).

As the Court found in its prior Decision and Order (Dkt. 53), this claim must be deemed exhausted and procedurally defaulted.  (*Id.* at 13-14).  The Court notified Petitioner that because of the procedural default, he cannot obtain habeas review of the claim unless he can show cause for, and actual prejudice, from the default; or that he is actually innocent. (*Id.*).  Although Petitioner acknowledges in his response (Dkt. 54) that the Court's Decision and Order gave him the opportunity to overcome the procedural default of this claim of trial court error (*id.* at 1), he did not attempt to do so.

The Court's independent review of the record reveals no basis to find cause for the procedural default and resultant prejudice.  Nor is there any suggestion that a constitutional error has resulted in the conviction of an actually innocent person for purposes of satisfying

the "fundamental miscarriage of justice" exception.  Accordingly, the claim of trial court error is subject to an unexcused procedural default and is dismissed on that basis.

**B.    The Claim Based on the Erroneous Denial of the Leave Application Is Not Cognizable on Habeas Review**

Petitioner asserts that the Appellate Division abused its discretion when it summarily denied his application for leave to appeal the trial court's denial of his C.P.L. § 440.10 motion.  (Dkt. 1 at 7).

Section 2254(a) permits federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty." 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

As the Court stated in its prior Decision and Order, an appellate court's denial of discretionary leave to appeal does not raise a constitutional issue cognizable on federal habeas review.  (Dkt. 53 at 14 (citing *Horton v. Recktenwald*, No. 115CV843MATMJR, 2017 WL 2957826, at *1 (W.D.N.Y. July 11, 2017) (finding that the petitioner's allegations that the appellate court wrongly denied his application for discretionary leave to appeal the denial of his motion to vacate under C.P.L. § 440.10 "could not be construed to raise a constitutional issue cognizable on federal habeas review" (citing *Shaut v. Bennet*, 289 F. Supp. 2d 354, 370 (W.D.N.Y. 2003) (habeas petitioner alleged that because "the trial court did not issue a 'written decision' when it denied either of his C.P.L. § 440.10 motions," "the Appellate Division improperly denied him leave to appeal" because it "'could not

- 13 -

possibly [have] conclude[d] that there existed no question of fact or law for review since that conclusion would have to have been based on the nonexistent written decision of the trial court'"; district court found that the petitioner "established no constitutional violation stemming from the appellate court's denial of leave to appeal"))))).  Accordingly, the claim based on the Appellate Division's denial of Petitioner's application for leave to appeal the denial of his C.P.L. § 440.10 motion is dismissed as not cognizable in this federal habeas proceeding.

## V.   **CONCLUSION**

For the reasons above, Petitioner's motion to withdraw his unexhausted claims (Dkt. 54) is granted, and the two unexhausted claims asserting ineffective assistance of trial counsel and ineffective assistance of appellate counsel are dismissed without prejudice.  Of the two remaining claims in the petition, the claim asserting that the trial court made erroneous rulings is subject to an unexcused procedural default; and the claim asserting that the Appellate Division erroneously denied Petitioner's application for leave to appeal the denial of his C.P.L. § 440.10 motion is not cognizable on habeas review.  Accordingly, the Court cannot grant relief on either claim.  Therefore, the petition (Dkt. 1) is dismissed.  Since Petitioner has not fulfilled the relevant criteria, the Court declines to grant a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1), (2).

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      July 22, 2024
            Rochester, New York